[Civ. No. 13150. First Dist., Div. Two. May 15, 1947.]

GRAHAM McPHAIL et al., Respondents, v. PACIFIC INDEMNITY COMPANY (a Corporation), Appellant.

Charles R. Burks for Appellant.

Wallace S. Myers for Respondents.

GOODELL, J.—Respondents sued appellant for $2,607.90 which they had been compelled to expend because of an earlier action brought against them for personal injuries and property damage. They recovered judgment in the instant case for $2,407.90, interest and costs, and this appeal was taken from the latter judgment.

On October 6, 1943, one Henry Zeidell sustained bodily injuries and property damage in a collision between an automobile driven by himself and a motorized concrete mixer then being operated by respondents upon and along the highway. When sued by Zeidell respondents called on appellant to undertake the defense as required by their policy. Appellant declined to do so, claiming that the risk was not within the terms of the policy but was, on the contrary, excluded by the language of a rider attached thereto. Zeidell recovered judgment against respondents in that action for $1,750. Attorneys fees for defending the action, fixed at $550, and costs and other expenses, $107.90, make up the $2,407.90 which respondents are out of pocket.

In March, 1942, respondents negotiated with appellant's general agent in San Rafael, F. Lloyd Grandi, for a policy of insurance. They already had a policy with Ocean Accident and Guarantee Corporation covering liability arising from the operation of *all their own motor vehicles*. Everybody connected with the transaction knew this, hence the negotiations had to do with an entirely different coverage. Appellant made a survey of the business operations of respondents and of the activities which they desired covered by the new policy, and investigated as well the policy which they already had covering the operation of motor vehicles owned by themselves. Respondent John McPhail talked with a representative of appellant some days before the policy was issued, and told him that they "wanted a comprehensive liability policy that would cover all operations of the business except that which was covered by the Ocean Accident on our own automobiles and they assured me that is what I would get; that is the policy they would write."

On April 1, 1942, the policy in question was written. Under the "Insuring Agreements" thereof appellant bound itself, " (1) To pay on behalf of the Assured all sums which the Assured shall become obligated to pay by reason of the liability imposed upon him by law or by written contract for damages (including damages for care and loss of services) because of bodily injury, disease or illness, including death at any time resulting therefrom, suffered or alleged to have been suffered, by any person or persons. . . . (2) To Pay on behalf of the Assured all sums which the Assured shall become obligated to pay by reason of the liability imposed upon him by law for damages because of injury to or destruction of property (including the loss of use thereof) arising out of the ownership, maintenance or use of automobiles, . . .''

Attached to the policy was "Endorsement No. 1," reading as follows:

"It is understood and agreed that the insurance provided by this policy, shall not extend to cover any bodily injuries, illness, death or property damage arising out of the ownership, maintenance or use by the assured of automobiles, motor vehicles, trailers and/or any non motor driven road making or maintenance equipment *while being towed behind or carried upon motor driven equipment, including the loading and unloading thereof.*" (Emphasis added.)

"Appellant contends," to quote from its brief, "that the plain, ordinary and popular meaning of Endorsement No. 1, is that the policy does not cover liability arising from:

"1. The ownership of motor vehicles; 2. The use of motor vehicles; 3. The maintenance of motor vehicles; 4. The ownership of trailers; 5. The use of trailers; 6. The maintenance of trailers; 7. And/or liability imposed upon the assured by reason of any motor driven road making or maintenance equipment while being towed behind or carried upon motor driven equipment, including the loading and unloading thereof."

The facts of the underlying case of *Zeidell* v. *McPhail Fuel Company* were simply that respondents were operating a piece of motorized concrete mixing equipment, *which they had hired,* upon and along the highway and caused it to run into the Ford automobile operated by Zeidell, causing him bodily injuries, and damaging his Ford.

It is clear that the policy never was intended to cover the operation of motor vehicles *owned by respondents* and that the vehicle which did the damage was admittedly hired. It is equally clear that trailers (4, 5 and 6 above) are in no way involved. It is clear that the vehicle which damaged Zeidell was not "being towed behind or carried upon motor driven equipment."

The contention of appellant, if sustained, would leave the policy to a large extent illusory for the rider would cancel out whatever protection the policy pretended to give with respect to damage done by motor vehicles, other than respondents' own, used or maintained by them. (See 2 and 3 above.)

Respondents testified that their understanding of the rider was that the concluding words thereof i. e., *"while being towed behind or carried upon motor driven equipment, including the loading and unloading thereof"* apply to and modify each and every type and kind of vehicle theretofore named.

Appellant contends that those words apply to and modify only "motor driven road making or maintenance equipment" and that the coverage of all other types and kinds of vehicles theretofore named is by this rider excluded.

The court found: "5. That said policy . . . was a comprehensive policy which insured plaintiffs against all and every risk of whatsoever kind or character, save and except certain

risks involving motor and non-motor driven equipment *while said vehicles were being towed behind or carried upon motor-driven equipment;* that the only exclusion of risk in said policy was the risk incurred while certain motor vehicles and non-motor driven road-making equipment *were being towed behind or carried upon other motor-driven equipment;* 6. That at all time[s] during the existence of the policy and prior to its issuance and during negotiations therefor, it was the intention and understanding of the parties that plaintiffs would be covered by insurance afforded by said policy in the operation of hired vehicles.'' (Emphasis added.)

These findings are amply supported by the record. The respondents' understanding of the rider has been already stated. That the trial judge read the rider in exactly the same way, and gave it the same meaning, appears from the language of the finding which we have emphasized. It is interesting to note, moreover, that this was the judge's first impression, for at the very outset, and before any evidence was introduced, he said:

''That looks to me as though it meant if I had a large truck and I carried either an automobile or a motor vehicle or a trailer or a non-motor-driven road-making or maintenance piece of equipment, like a scraper or a road machine, and towed it behind my large truck or carried it upon it, including loading and unloading thereof, it would not be insured while it was either being towed or carried upon the truck. On first reading that is the way it looks to me.''

The evidence (introduced in a one-day trial) did not change in the least the judge's first impression, but rather confirmed it, for at the close of the trial he said: ''Well, this case seems to me relatively as rather simple. It turns on the construction given on the first rider to the policy. I read it this morning and heard the arguments pro and con about it since, and I have not changed my views of it. To me I read it one way, without ambiguity—I think it covers automobiles except that they are either towed or carried on another automobile. If, to take Mr. Burks' construction of it, instead of putting something in there that may have some ambiguity—it doesn't to me—instead of putting some clause in there like that why didn't they say 'Endorsement No. 1—this policy does not cover automobiles or motor vehicles of any kind or character at any place.' Period. Then there would be no ambiguity at all. There it would be, right there. They were drawing the

document; it was their wording. They fathered it and put it out. It was accepted, and instead of wording it like that where a seven-year-old child could read it and understand it they worded it in another way. So I think that the vehicles were covered by the policy and that any attempted modification was not the fault of Mr. McPhail; in fact, he knew nothing about it, and if Mr. Grandi was negligent it possibly went to some of the higher-ups because they did nothing for quite a while, and there was some controversy. They took it very easy and did not do much about the reformation or cancellation. Mr. Grandi refused to accept it. If he did wrong in doing that—I don't think he did—but if he did wrong in doing that that doesn't relieve the company from their obligation to Mr. McPhail, their insured. I do not think it is necessary to decide the case on estoppel. I think the view I take of it is decisive of the case and I will render judgment accordingly for the amount that has been stipulated here.''

The reference by the judge to an ''attempted modification'' undoubtedly related to the following circumstances: After the policy had been in effect a couple of months appellant notified its San Rafael general agent, Grandi, that it had cancelled endorsement No. 1 (quoted above) and replaced it with endorsement No. 3 reading as follows: ''. . . This policy shall not extend to cover bodily injuries, illness of [or] death or damage to property arising out of the use by or for the assured of any motor vehicle owned by, registered in the name of, *or hired by the assured.* . . .'' (Emphasis added.) Appellant gave as its reason for this change that as endorsement No. 1 then read *the assured would not have coverage even on nonowned cars.* The full connotation of ''non-owned'' in insurance parlance is not disclosed by this record, which is none too clear at best. However this may be, the proposed endorsement, in the clearest kind of language, provided that the policy should not extend to any motor vehicle ''hired by the assured.'' Grandi promptly notified appellant's special agent that he *would not* have it attached to the policy or substituted for endorsement No. 1 because it did not conform to the agreement of the parties, in that it excluded hired vehicles. To this rather positive assertion the special agent replied that he would take it up with appellant and if Grandi heard nothing further he could disregard the proposed endorsement No. 3. Grandi heard nothing further; he did disregard it; he wrote ''Refused''

on it and filed it away without even consulting the respondents. Respondents learned nothing of this attempted change until about a week before the trial of this case. The action of Grandi, through whom this policy was negotiated, indicates that he understood the policy in the same sense as respondents understood it, and in the same sense as the judge understood it. Grandi's refusal to make the change and appellant's acquiescence, unquestionably impressed the court, and influenced him in arriving at the finding that hired vehicles were covered.

The judge's reference to the appellant taking it very easy, doubtless relates to the following incident: On September 27, 1943, which was just nine days before the Zeidell collision, respondents told Grandi that they had hired three pieces of motorized concrete mixing equipment, and were checking with him to make sure that their policy covered the risk of operation of such hired vehicles. Grandi assured them that it did, and promised to write appellant. That evening he did so, requesting an endorsement under the "Hired cars" section of the policy, covering three Ford trucks with four-yard concrete mixers for both public liability and property damage. Appellant received the letter but did not communicate with either Grandi or respondents concerning it.

If, when this question was put squarely up to appellant, it had overruled Grandi and had flatly taken the position that the policy did *not* cover hired vehicles, and that they would *not* write a hired car rider, respondents could have gone elsewhere for this coverage before their hired truck collided with Zeidell and subjected them to the defense of litigation eventuating in a judgment against them. The foregoing incident forms the subject matter of respondents' second count, based on estoppel. On that count the court made a finding in favor of respondents, which we are satisfied is amply supported by the conduct not only of appellant's general agent, but by that of appellant as well, in the face of full knowledge on the two occasions just recounted.

Appellant contends, as we have seen, that endorsement No. 1 means something altogether different from what the court held it to mean. Respondent aptly says, "If a Judge of the Superior Court cannot understand the policy the way appellant would urge this Court to understand it, then certainly respondents cannot be blamed for understanding the language of endorsement No. 1 as they did."

While the judge did not find the rider ambiguous, he remarked that there was "something in there that may have some ambiguity" and in a few words he showed how simple it would have been for appellant's draftsman to have removed all doubt. If it be conceded that the language is ambiguous, then the case is brought within the familiar rule that "it is to be construed most strongly against the insurer, who is presumed to have drawn the policy and caused the uncertainty to exist."' (Civ. Code, § 1654; 14 Cal.Jur. 443-445 and 7 Cal. Jur. 10-Yr.Supp. (1945 Rev.) 89, and cases cited.) The judge had this rule in mind when he said, "They were drawing the document; it was their wording. They fathered it and put it out."

The testimony respecting the survey and investigation made by appellant before it wrote the policy; the statement made by John McPhail to appellant's representative of just what coverage they wanted, and the assurance, quoted earlier, that that was what they would get, "that is the policy they would write" indicates that appellant knew the sense in which respondents understood the policy, and warranted the court in putting that construction on it (Civ. Code, § 1649). As was said in *Goss* v. *Security Ins. Co.,* 113 Cal.App. 577, 580 [298 P. 860], "A policy or contract of insurance is to be construed so as to ascertain and carry out the intention of the parties, viewed in the light of surrounding circumstances, the business in which the insured is engaged and the purpose they had in view in making the contract. (32 Cor.Jur. p. 1150; *Ogburn* v. *Travelers Ins. Co.,* 207 Cal. 50 [276 P. 1004].)"

Whichever way the case is viewed, ambiguity or no ambiguity, the conclusion reached by the court, in our opinion, was correct.

 Finally, it is contended that, as no premium was paid for hired vehicles no recovery should be had. The complaint alleged that respondents had "paid, when due, all premiums and charges for said policy during the period it was effective." In paragraph IV of its answer appellant expressly admitted this (and the court so found) but later, in paragraph IX, it denies it. Be this as it may, it clearly appears that the policy provided for a basic or minimum premium and for periodical audits based on the exposure to risk because of the insured's operations, looking to additional premiums. The billing of

premiums was appellant's own concern. There is no claim that respondents' books were not open to audit at all times. The hired vehicles were put into commission about nine days before the collision, and it is obvious that after the collision appellant could not very well have charged for premiums on hired cars without thereby admitting that hired cars were covered.

There is no need to discuss respondents' third count based on reformation, or the authorities cited on that point.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.